UNITED STATES DISTRICT COURT
DISTRICT OF NORTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| **North Dakota Board of University and School Lands** and the **North Dakota Office of State Engineer**, <br><br> Plaintiffs, <br><br> vs. <br><br> **United States Department of the Interior**; **David Bernhardt**, in his capacity as Secretary of the United States Department of the Interior; **United States Bureau of Land Management**; **William Pendley**, in his capacity as acting director of the United States Bureau of Land Management and its Deputy Director for Policy and Programs; **John Mehlhoff**, in his capacity as the Bureau of Land Management's State Director for Montana and the Dakotas; and the **Interior Board of Land Appeals**, <br><br> Defendants. | **Complaint for Judicial Review of Agency Action** |

## Introduction

1.     This case concerns the accurate location of the boundary between the bed of the Missouri River, owned by the State of North Dakota, and tracts of land riparian to the river owned by the United States. That boundary is the ordinary high water mark ("OHWM"). Land boundaries are important for many and obvious reasons. Here, the immediate practical need to accurately locate the OHWM is to

identify the owner of the underlying minerals that are being produced from wells that have been operating for a number of years. At stake is the right to several million dollars of oil and gas royalties on past production and likely additional millions attributable to ongoing and future production.

2.     The United States Bureau of Land Management ("BLM") within the United States Department of the Interior ("DOI") issued Supplemental Plats depicting where it believes the OHWM is located on certain tracts of federal land located in the following areas:

> Township 154 North, Range 95 West;
> Township 154 North, Range 96 West;
> Township 154 North, Range 97 West; and
> Township 154 North, Range 98 West.
>
> (Collectively, "Subject Lands.")

3.     Federal jurisprudence provides that while federal law may govern a dispute, in some instances "state law should be borrowed and applied as the federal rule for deciding the substantive legal issue . . . ." *California ex rel. State Lands Comm'n v. United States*, 457 U.S. 273, 283 (1982). Even disputes over federal property, should, in general, be resolved by adopting and applying state property law. There is "no imperative need" for federal law to decide cases involving title to federal land. *Wilson v. Omaha Indian Tribe*, 442 U.S. 653, 673 (1979). However, in identifying the OHWM on the Subject Lands, DOI and its BLM did not apply state OHWM standards, but rather applied federal standards. The two sets of standards have differences in the criteria used to identify OHWMs and those differences resulted in identifying the OHWM at different locations on the Subject Lands.

Because federal standards were used to prepare the Supplemental Plats at issue, those plats do not accurately depict the location of the OHWM. Plaintiffs seek to have the plats set aside.

### Related Litigation

4.      There is pending in this Court *XTO Energy, Inc., and XTO Holdings, LLC, v. North Dakota Board of University and School Lands, and the United States of America*, Case 1:19-cv-00076 ("XTO Energy"), which is an interpleader action concerning the right, as between the defendants, to receive royalty revenues held by XTO Energy attributable to the production of oil and gas from:

> Section 25, Township 154 North, Range 95;
> Section 25, Township 154 North, Range 97 West; and
> Sections 26 and 29, Township 154 North, Range 96 West.

The OHWM on these tracts are the subject of the Supplemental Plats referred to above. As the *Complaint* in *XTO Energy* describes, both North Dakota and the federal government have issued oil and gas leases covering, in part, the same land from which oil and gas is being produced by XTO-operated wells. The *Complaint* states that through April 25, 2019, there is at least $2,714,965.82 of royalty revenues in dispute and that production is ongoing. *XTO Energy* (ECF #1, ¶30). A stipulation filed July 20, 2020, by the parties in *XTO Energy* (ECF #50, ¶3), states that as of that date, $3,031,653.74 of royalty revenues is in dispute, although this amount does not include all the wells at issue in *XTO Energy*.

## Parties

5.     Plaintiff North Dakota Board of University and School Lands ("Land Board") is a North Dakota state governmental entity established under the state constitution. N.D. Const. art. 9, § 3. One of the Board's responsibilities is to manage state-owned oil, gas, and related hydrocarbons underlying the state's sovereign lands. N.D.C.C. §§ 61-33-02 and -03. Sovereign lands include the beds of navigable rivers lying within the OHWM. N.D.C.C. § 61-33-01(5).

6.     Plaintiff North Dakota Office of State Engineer ("State Engineer") is a North Dakota state governmental agency headed by the State Engineer. N.D.C.C. ch. 61-03. One of the State Engineer's responsibilities is to manage all state-owned possessory interests, except oil, gas, and related hydrocarbons, in the state's sovereign lands. N.D.C.C. §§ 61-33-02 and -03.

7.     Defendant DOI is a cabinet-level agency of the federal government. Among its responsibilities is managing certain lands owned by the United States, including the Subject Lands.

8.     Defendant David Bernhardt is the Secretary of DOI. He is sued in his official capacity as DOI's Secretary. Secretary Bernhardt is responsible for managing certain lands owned by the United States, including the Subject Lands.

9.     Defendant BLM is a bureau within DOI. Among its responsibilities is managing certain lands owned by the United States, including the Subject Lands. One of the BLM's administrative regions is "Montana/Dakotas," covering Montana, South Dakota, and North Dakota and in which BLM manages federally owned land,

4

including the Subject Lands. BLM programs include the Cadastral Survey Program, the work of which includes surveying the boundary of federally owned land. *See, e.g.,* 43 U.S.C. §§ 2, 772. The BLM, through its Cadastral Survey Program, conducted the OHWM surveys and based on those surveys issued the Supplemental Plats at issue in this lawsuit.

10.     Defendant William Pendley is the BLM's Deputy Director for Policy and Programs and who, on information and belief, exercises the authority of the Director of the BLM.

11.     Defendant John Mehlhoff is the State Director for the BLM's Montana/Dakotas Region. He is sued in his official capacity as State Director. Director Mehlhoff is responsible for managing certain lands owned by the United States, including the Subject Lands.

12.     Defendant Interior Board of Land Appeals ("IBLA") is an administrative tribunal within DOI that exercises authority to adjudicate public land disputes. *See* 43 C.F.R. Part 4; 43 C.F.R. § 4.1(b)(2). The IBLA issued the administrative decision at issue in this lawsuit, that is, *North Dakota Office of the State Engineer & North Dakota Board of University & School Lands*, 195 IBLA 194 (IBLA 2016-170, Mar. 25, 2020). The decision is Exhibit 1 to this *Complaint*.

### Jurisdiction and Venue

13.     The court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question) and 5 U.S.C. §§ 701-706 (administrative procedure act) (judicial review of agency action).

14.    The relief requested is authorized by 28 U.S.C. §§ 2201 (declaratory relief) and 2202 (further relief), by 5 U.S.C. §§ 705-706 (administrative procedure act), and the Court's inherent authority.

15.    This action concerns the boundary between land owned by the United States and land owned by North Dakota that is located in the North Dakota counties of Williams and McKenzie. Thus, venue is proper in this district under 28 U.S.C. § 1391(b)(2) and (e)(1) and D.N.D. Civil L. R. 3.1(A).

### Factual and Procedural Background

16.    At statehood, under federal law, in particular the equal footing doctrine, North Dakota took title to the beds of navigable rivers and lakes. *See, e.g., PPL Montana, LLC v. Montana*, 565 U.S. 576, 590-91 (2012). Congress has confirmed state "title to and ownership of the lands beneath navigable waters," declaring state title "to be in the public interest." 43 U.S.C. § 1311(a). At statehood, the Missouri River was navigable and hence North Dakota took title to the bed of the river. *E.g., Brigham Oil & Gas, L.P. v. N.D. Bd. of Univ. & Sch. Lands*, 866 F. Supp. 2d 1082, 1084-85, 1088 (D.N.D. 2012); *Hogue v. Bourgois,* 71 N.W.2d 47, 52 (N.D. 1955). The geographic extent of the state's riverbed ownership is from OHWM to OHWM. *Reep v. State,* 2013 ND 253, ¶¶24-26, 841 N.W.2d 664.

17.    The federal Flood Control Act of 1944, Pub. L. No. 78-534, 58 Stat. 887 (1944), authorized construction of dams on the Missouri River, including Garrison Dam, which was built under the authority of the Act about seventy miles northwest

of Bismarck. The dam was constructed in the 1950s, and when completed,
inundated land behind the dam formed the bed of Lake Sakakawea.

18.     Much of Lake Sakakawea is within the oil and gas producing region of
western North Dakota. Oil was discovered in North Dakota in the early 1950s, but
for decades minerals under Lake Sakakawea were seldom developed because the
lake presented obstacles to drilling. However, modern drilling technology allows oil
companies to reach and produce minerals under the lake. Horizontal wellbores
allow recovery of oil and gas from under the lake and from under the bed of the
Missouri River as it existed prior to construction of Garrison Dam, that is, the
"historic river."

19.     Horizontal drilling technology led to title questions and disputes
involving minerals under the Missouri River and Lake Sakakawea. There have been
public and private investigations of title and of the title consequences of erosion,
accretion, avulsion, and reliction, forces that, until the construction of dams on the
Missouri River, led to constant changes in the course of the historic river and hence
the location of its OHWM.

20.     In 2010, the Land Board studied the location of the historic OHWM
along a 92-mile stretch of the Missouri River inundated by Lake Sakakawea,
including the Subject Lands. Ex. 1, 195 IBLA at 200. The study was led by the
engineering firm, Bartlett & West. The study concluded with the following report:
Bartlett & West and McCain and Associates, Inc., *Final Technical Report for the*
*Ordinary High Water Mark Investigation for the Missouri River under Lake*

*Sakakawea (From Furlong Loop to New Town, ND)* (Mar. 2011) (hereafter "Bartlett
& West 2011 OHWM Report," a/k/a "Phase 2 Study").[1] In locating the historic
OHWM, Bartlett & West applied state standards and guidelines. *Id.* at 2; Ex. 1, 195
IBLA at 200, 204. Because the area studied is under Lake Sakakawea, Bartlett &
West could not perform an on-the-ground analysis of such factors as soils,
vegetation, and certain other factors, and so it interpreted aerial photos of the
historic river taken in the 1940 and '50s, an interpretation informed by Bartlett &
West's earlier OHWM delineation work along the Yellowstone River in North
Dakota and parts of the Missouri River in North Dakota not inundated by Lake
Sakakawea,[2] and by the State Engineer's *Ordinary High Water Mark Delineation
Guidelines*, adopted in 2007.[3] The Subject Lands were included in the Land Board's
*Bartlett & West 2011 OHWM Report* (Phase 2 Study).

     21.    The BLM manages public domain land in North Dakota. Public
domain land is land that has always been owned by the United States. Public
domain land managed by the BLM in North Dakota includes some of what was
riparian land along the Missouri River prior to inundation by Lake Sakakawea,
that is, it includes some land riparian to the historic river.

---

[1] https://www.land.nd.gov/sites/www/files/documents/Minerals/OHWM2/ohwm%20report.pdf

[2] https://www.land.nd.gov/sites/www/files/documents/Minerals/OHWM1/OHWM%20REPORT.pdf

[3] https://www.land.nd.gov/sites/www/files/documents/Minerals/OHWM1/OHWMguidelines.pdf

22.     The BLM's Branch of Cadastral Survey studied the location of the OHWM on portions of the historic river, which resulted in preparing Supplemental Plats for the Subject Lands. Ex. 1, 195 IBLA at 195-96.

23.     The purpose of the Cadastral Survey's OHWM study was to update the boundaries of the public domain tracts and, thus, the boundary between federal land and the state-owned riverbed, which would provide location and acreage information to be used by the BLM in leasing public domain tracts for mineral development. Ex. 1, 195 IBLA at 195-96, 198. On information and belief, the federal government has issued four oil and gas leases that cover the Subject Lands and those leases are still in effect.

24.     The BLM's work delineating the OHWM was conducted according to federal standards and guidelines. Ex. 1, 195 IBLA at 201, 207, 210.

25.     The Land Board's *Bartlett & West 2011 OHWM Report* (Phase 2 Study) and the BLM's Supplemental Plats do not in all instances agree where the OHWM is located on the Subject Lands. *See, e.g.,* Ex.1, 195 IBLA at 201, 202-04, 207.

26.     Practical consequences of the differences arise because the Land Board has issued eight oil and gas leases covering the Subject Lands and did so relying on the *Bartlett & West 2011 OHWM Report* (Phase 2 Study). These leases, which are still in effect, compete with oil and gas leases issued by the federal government that also include the disputed acreage in the Subject Lands. The disputed, overlapping acreage amounts to at least several hundred acres. The BLM "believes the difference amounts to many hundreds of acres . . . ." Ex. 1, 195 IBLA at 207. *See*

9

*also, id.* at 203. Oil and gas wells operated by XTO Energy have been drilled that produce minerals underlying the disputed acreage, placing at least several million dollars of oil and gas royalty revenues in question. *Supra*, ¶ 4.

27.     After the Cadastral Survey completed its work, the BLM published a "Notice of Filing Plats of Survey; North Dakota." 79 Fed. Reg. 38,562 (July 8, 2014). The *Notice* stated the BLM intended to formally file the Supplement Plats, noting the survey "was necessary to determine federal leasable mineral lands." *Id.* at 38,563.

28.     After the *Notice* was published, the Land Board and State Engineer filed with the BLM *Protests* challenging the filing of the Supplementary Plats. *See* Ex. 1, 195 IBLA at 202.

29.     In March 2016, the BLM rejected the *Protests*. Ex. 1, 195 IBLA at 203.

30.     The Land Board and State Engineer appealed the BLM's decision to the IBLA.

31.     In its appeal, the Land Board and State Engineer argued that the BLM used the wrong standards and guidelines to determine the OHWM location. It used standards and guidelines promulgated by the federal government. The Land Board and State Engineer argued federal law required that the BLM apply state-promulgated standards and guidelines, and having failed to do so, the Supplemental Plats have significant errors, should not have been issued, and should be withdrawn.

32.     The IBLA rejected these arguments in *North Dakota Office of the State Engineer & North Dakota Board of University & School Lands*, 194 IBLA 195 (IBLA 2016-170, Mar. 25, 2020), Exhibit 1 to this *Complaint*.

33.     The IBLA's decision was final agency action. *E.g.,* 43 C.F.R. §§ 4.21(d), 4.403(a).

### Claim for Relief

34.     All preceding paragraphs are re-stated.

35.     The Supreme Court has held that although federal law governs title disputes over federal land, it is state law, in general, that should be applied as the federal rule of decision. *Wilson*, 442 U.S. at 673. The Court stated it is a "'familiar doctrine [that] it is for States to establish for themselves such rules of property as they deem expedient with respect to the navigable waters within their borders and the riparian lands adjacent to them . . . .'" *Id.* at 675-76 (quoting *Arkansas v. Tennessee*, 246 U.S. 158, 176 (1918)). The general law of deference to and reliance on state property law applies even where federal interests are at stake. *E.g., id.* at 676. The IBLA itself has applied the rule, relying on North Dakota property law to decide whether land along the Missouri River was owned by the United States or by the state. *David A. Provinse*, 89 IBLA 154, 158-59, 1985 WL 57767 (IBLA No. 84-776, Oct. 4, 1985).

36.     An underpinning rationale for the rule is federalism and respect for the role of states under the federal Constitution and how power between states and

11

the federal government is distributed and shared. Here, federalism functions to prevent the Defendants from imposing a nationwide law.

37.   Congress has confirmed state title to lands beneath navigable waters, and in doing so declared it "to be in the public interest" that states have "the right and power to manage [and] administer" those lands "in accordance with applicable State law . . . ." 43 U.S.C. § 1311(a).

38.   In upholding the Supplementary Plats, the IBLA declined to apply the general rule deferring to state law. The following is a summary of the IBLA's analysis and a summary of some reasons why the analysis is flawed.

a.   The IBLA stated that to defer to state law would allow a state to enlarge its riverbed "at any time simply by adopting a more expansive interpretation of the OHWM." Ex. 1, 195 IBLA at 212; *see also id.* at 214. It cited nothing to support this speculation. While the IBLA did refer to North Dakota having "redefined" its OHWM standard and thereby "stacked the deck," Ex. 1, 195 IBLA at 214-15, it cited nothing to support these statements about redefining state law and stacking the deck. In 2007, the State Engineer did adopt guidelines for locating the OHWM, *supra* n.3, but these guidelines did not redefine OHWM law; they articulated and are based on longstanding North Dakota law developed by the North Dakota Supreme Court in such cases as *Rutten v. State*, 93 N.W.2d 796 (N.D. 1958), and *In re Ownership of the Bed of Devils Lake*, 423 N.W.2d 141 (N.D. 1988).

b.   The IBLA stated the Land Board and State Engineer "implicitly" relied on the equal footing doctrine, and then

12

explained why the doctrine does not support the state. Ex. 1,
195 IBLA at 213-14. The Land Board and State Engineer did
not rely on the doctrine explicitly or implicitly. The IBLA
used the doctrine as a "strawman" argument to support its
decision.

c.  The IBLA stated that applying state standards and
guidelines would result in a dispossession of federal land,
something that can be done only by Congress. Ex. 1, 195
IBLA at 212. However, federal courts, including the Supreme
Court in *Wilson,* 442 U.S. 653, have applied state property
law and in doing so adversely affected federal property
interests, as did the IBLA itself in *David A. Provinse,* 1985
WL 57767, in which it applied state law to determine that
North Dakota and not the United States owned land along
the Missouri River. The issue is not "dispossession" – which
starts with the improper assumption of federal title to the
disputed land – but rather identifying the proper standards
and guidelines to accurately locate the boundary between
state land and federal land.

d.  The IBLA stated applying federal standards and guidelines
would not affect any existing relationships. Ex. 1, 195 IBLA
at 215. This is incorrect. The Land Board has issued oil and
gas leases covering the Subject Lands. These leases are in
effect. The failure to apply state standards and guidelines to
determine the OHWM on the tracts leased will require
reductions in the acreage covered by those leases.

e.  As an alternative rationale for its decision, the IBLA stated a recently enacted statute, N.D.C.C. § 61-33.1-06, supports rejecting the challenge to the Supplementary Plats. Ex. 1, 195 IBLA at 218-19. The statute states that on certain public domain land the BLM is to locate the OHWM "in accordance with federal law." Federal law defers to and borrows state property law.

39.  An agency action is unlawful and can be set aside by a court if, among other things, it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" if it is "contrary to constitutional right, power, privilege, or immunity;" or if "in excess of statutory jurisdiction or authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (B), (C).

40.  In upholding the BLM's Supplementary Plats and the BLM's use of federal standards and guidelines for locating the OHWM on the Subject Lands, the IBLA erred. It should have invalidated the Supplementary Plats and held that the BLM should have applied state standards and guidelines for locating the OHWM on the Subject Lands. Failing to do so, the IBLA's decision was, among other things, arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law; contrary to constitutional rights, powers, and privileges; or in excess of statutory jurisdiction or authority, or limitations, or short of statutory right.

41.  The IBLA's error constitutes a legal wrong. Its decision is inconsistent with federal jurisprudence and federal statute. The IBLA's error harms state proprietary interests by depriving the state of title to land and the land's underlying resources and of fiscal benefits that flow from title. The error harms the state's

14

governmental and sovereign interests by not only displacing application of state

property law, but also by limiting the scope of state regulatory authority and

limiting state authority to administer and manage under state law the bed of a

navigable river.

## Relief Requested

Wherefore, the Plaintiffs request the Court enter judgment in their favor and

against Defendants on the Claim for Relief and do the following:

1. Set aside and vacate the IBLA decision, *North Dakota* 195 IBLA 194.

2. Declare the Supplementary Plats unlawful and void.

3. Enjoin Defendants DOI, Bernhardt, BLM, Pendley, and Mehlhoff from taking any action that applies or implements the Supplementary Plats.

4. Award Plaintiffs the costs and attorney fees they incur in pursuing this action, as authorized by the Equal Access of Justice Act, 28 U.S.C. § 2412 and any other applicable statute or law.

5. Award such other relief the Court deems just.

*[Signatures are on the following page.]*

15

Dated October 9, 2020.

State of North Dakota
Wayne Stenehjem
Attorney General

By */s/ Charles M. Carvell*
    Charles M. Carvell, No. 03560
    Special Assistant Attorney General
    cmc@pearce-durick.com
    314 East Thayer Avenue
    P.O. Box 400
    Bismarck, ND  58502-0400
    Telephone (701) 223-2890
    Facsimile (701) 223-7865

    David P. Garner, No. 06860
    dpgarner@nd.gov
    Assistant Attorney General
    Office of the Attorney General
    500 North 9th Street
    Bismarck, ND  58501-4509
    Telephone (701) 328-3640
    Facsimile (701) 328-4300

    Jennifer L. Verleger, No. 06732
    jverleger@nd.gov
    Assistant Attorney General
    Office of the Attorney General
    500 North 9th Street
    Bismarck, ND  58501-4509
    Telephone (701) 328-3640
    Facsimile (701) 328-4300

    *Attorneys for Plaintiffs North Dakota*
    *Board of University and School Lands*
    *and North Dakota Office of State*
    *Engineer*