

# United States Department of the Interior
## Office of Hearings and Appeals
Interior Board of Land Appeals
801 N. Quincy St., Suite 300
Arlington, VA 22203

703-235-3750                             703-235-8349 (fax)

## NORTH DAKOTA OFFICE OF THE STATE ENGINEER &
## NORTH DAKOTA BOARD OF UNIVERSITY & SCHOOL LANDS

IBLA 2016-170                                   Decided March 25, 2020

Appeal from a decision of the Montana State Office, Bureau of Land Management, dismissing protests challenging the official filing of supplemental survey plats. Group No. 92, North Dakota.

Affirmed.

APPEARANCES: Charles M. Carvell, Esq., Bismarck, North Dakota, and Hope L. Hogan, Esq., and Jennifer L. Verleger, Esq., Office of the Attorney General, State of North Dakota, Bismarck, North Dakota, for appellants; Karan L. Dunnigan, Esq., Office of the Field Solicitor, U.S. Department of the Interior, Billings, Montana, for the Bureau of Land Management.

### OPINION BY ADMINISTRATIVE JUDGE HAUGRUD

### SUMMARY

The North Dakota Office of the State Engineer and the North Dakota Board of University and School Lands (collectively, the State or North Dakota) have appealed from a Decision dated March 23, 2016, by the Montana State Office, Bureau of Land Management (BLM).[1] In its Decision, BLM dismissed the State's protests to the official filing of Supplemental Plats that show BLM's determination of the boundary between Federal uplands and State riverbed along portions of the Missouri River.[2] The two State

---

[1] Notice of Appeal (Apr. 25, 2016).
[2] Letter from Aden Seidlitz, Acting BLM State Director, to Lance D. Gaebe, North Dakota Comm'r of Univ. & School Lands, and Todd Sando, North Dakota State Engineer (Mar. 23, 2016) (BLM Decision). The challenged BLM Decision is found in the Administrative Record (AR) in Record #1, Folder #1, Doc. 72. This citing convention

agencies have regulatory and proprietary responsibility over the bed of the Missouri River in North Dakota.[3]

BLM prepared the Supplemental Plats to ascertain the location and acreage of certain Federally owned tracts of inundated public domain land underlying Lake Sakakawea, the reservoir formed by Garrison Dam on the Missouri River.[4] BLM wished to lease the tracts for mineral development and needed accurate information on the boundary between State and Federal ownership interests.[5]

For the parcels at issue, the State/Federal boundary is marked by the Ordinary High Water Mark (OHWM) of the Missouri River immediately before its impoundment in the 1950s to form Lake Sakakawea. BLM's objective in creating the Supplemental Plats was to identify this historical OHWM for selected riparian public domain parcels that had remained in Federal ownership continuously since before North Dakota's statehood. For these parcels, the State owns the riverbed below the historical OHWM, while BLM owns the retained fast lands above it.[6]

The State believes BLM erred because it applied Federal law, rather than State law, in making its assessment of the historical OHWM.[7] The State believes this error led BLM to depict an inaccurate OHWM boundary in its Supplemental Plats that improperly shows many areas as being Federally-owned uplands whereas a properly placed OHWM would show those lands to be State-owned riverbed below the real OHWM. We conclude, however, that BLM properly applied Federal law in delineating the OHWM for the parcels at issue. Accordingly, we affirm BLM's decision.

BACKGROUND

The Supplemental Plats cover only select reaches of the Missouri River, pertaining to land in four townships denominated as North Dakota, Fifth Principal Meridian, T. 154

---

(Record, Folder, Document number) is used throughout this opinion in citations to the AR.

[3] See Statement of Reasons at 1-2 (filed June 23, 2016) (SOR).

[4] AR, Record #1, Folder #1, Doc. 58, Letter from Jamie E. Connell, BLM State Director, to Lance D. Gaebe, Comm'r of Univ. & School Lands, at 1-2 (Sept. 29, 2014) [hereinafter 2014 BLM Letter to State Commissioner].

[5] See id. at 2.

[6] Throughout this opinion, "fast land" and "upland" are used synonymously to refer to land that is above or landward of the OHWM. "Submerged land" and "riverbed" are used to refer to land below the OHWM.

[7] SOR at 7-12.

North, Ranges 95, 96, 97, and 98 West (hereinafter, the Townships). The Supplemental Plats are also limited in the type of property they concern: they deal only with the location and boundary of Federal "public domain lands."[8] For surveying purposes, BLM defines "public domain lands" as lands that "were acquired by the United States from another sovereign and have never left Federal ownership.[9] The Supplemental Plats accordingly do not delineate or otherwise affect the boundary between State riverbed and any other riparian property – whether privately held or even Federally acquired after North Dakota's statehood.[10] The Supplemental Plats reflect this limited scope by all stating that they were "prepared for the purpose of delineating the boundaries of *Public Domain* oil and gas interests and determining the acreage of the areas that were affected by the movement of the Missouri River prior to the artificial flooding of Lake Sakakawea."[11]

Before BLM prepared the Supplemental Plats in 2014, there were three notable attempts to delineate the riverbed through these Townships: the 1896 General Land Office Survey, the 1952 Corps of Engineers/BLM "Segment Maps," and the 2011 Study on the OHWM prepared for the State by Bartlett & West and McCain and Associates. Because each of these prior studies is relevant to the discussion of the current controversy over the OHWM, we discuss them below before describing the preparation and protest of BLM's Supplemental Plats. As an initial matter, however, we discuss the background legal principles underlying this boundary and title dispute.

---

[8] *See* 2014 BLM Letter to State Commissioner, *supra* note 4, at 2 (explaining that the Supplemental Plats were being created to "updat[e] the legal land descriptions of Public Domain parcels only, accounting for the movement of the Missouri River between original survey to just prior to the artificial rising of Lake Sakakawea. Cadastral Survey is creating these Supplemental Plats . . . to define the boundaries of Public Domain lands. . . . Once officially filed, these Supplemental Plats will be the decision record that depicts and governs the Public Domain interests of the Federal Government . . . .").

[9] Manual of Surveying Instructions for the Survey of the Public Lands of the United States, BLM Cadastral Survey, at § 1-13 (pages 4-5) (2009), https://www.blm.gov/sites/blm.gov/files/Manual_Of_Surveying_Instructions_2009.pdf (last visited Mar. 23, 2020) (2009 Survey Manual).

[10] *See* 2014 BLM Letter to State Commissioner, *supra* note 4, at 2 (stating that the Supplemental Plats update "the legal land descriptions of Public Domain land only"); *see also* Decision at 1 (stating that the State's ownership claims in the Townships to land acquired by the U.S. Army Corps of Engineers "are not addressed on the Supplemental Plats").

[11] AR, Record # 8, Supplemental Plat for T. 154 N., R. 95 W. (Sheet 1 of 3) (emphasis added).

A.    *Legal Basis for the State's Ownership of the Riverbed and BLM's Surveying Duties*

When North Dakota became a State in 1889, it automatically gained title to the beds of unreserved navigable waterways within its borders under the Equal Footing Doctrine, including the segment of the Missouri River at issue here.[12] Under this doctrine, each State enters the Union with equal sovereignty as the other States, including the right recognized of the thirteen original States to "'their navigable waters and the soils under them,' subject only to rights surrendered and powers granted by the Constitution to the Federal Government."[13] The title granted to the State extends to the OHWM.[14] The OHWM thus serves as the boundary between the State-owned riverbed and the Federally-owned riparian public domain land above the OHWM.

A defining feature of the OHWM as an ownership boundary is that it is ambulatory, changing as the river or lake bed changes due to processes such as erosion, accretion, reliction, and avulsion.[15] Between the time of statehood and the filling of Lake Sakakawea in the 1950s, the location of the OHWM of the Missouri River unquestionably changed in many reaches because of these processes. However, in the Townships at issue no further changes could occur to the riverbed's OHWM once the river valley was inundated by the filling of Lake Sakakawea, so the State/Federal boundary of riparian public domain land was effectively fixed at that time. The State does not dispute this

---

[12] *See, e.g., PPL Montana, LLC v. Montana,* 565 U.S. 576, 591 (2012); *State v. Mills,* 523 N.W.2d 537, 539 (N.D. 1994).

[13] *PPL Montana, LLC,* 565 U.S. at 590 (quoting *Martin v. Lessee of Waddell,* 41 U.S. 367, 410 (1842)).

[14] *See Shively v. Bowlby,* 152 U.S. 1, 27 (1894) ("The new States admitted into the Union since the adoption of the Constitution have the same rights as the original States in the tide waters, and in the lands below the high water mark, within their respective jurisdictions."); *State v. Mills,* 523 N.W.2d at 539 ("Upon admission to the Union, North Dakota was entitled to sovereign ownership of the beds of navigable waters from high watermark to high watermark under the equal footing doctrine." (citing Supreme Court case law)).

[15] *See State ex rel. Sprynczynatyk v. Mills,* 592 N.W.2d 591, 592 (N.D. 1999) ("The ordinary high watermark is ambulatory, and is not determined as of a fixed date."); *In re Ownership of the Bed of Devils Lake,* 423 N.W.2d 141, 144 (N.D. 1988) (holding that the State's ownership of the bed of navigable Devils Lake was set by the OHWM, was ambulatory, and subject to doctrine of reliction).

point in its appeal.[16] BLM's intent in preparing the Supplemental Plats was to establish this fixed boundary for the public domain lands in the Townships.[17]

BLM has long had the authority and duty to survey, and thus establish boundaries on, public domain land.[18] The BLM's Manual of Surveying Instructions provides the official and binding rules for surveying public domain lands,[19] with the most recent one, under which the Supplemental Plats were prepared, published in 2009.[20] The 2009 Survey Manual provides procedures for identifying the OHWM[21] and preparing Supplemental Plats.[22] When Federal land is not involved, however, BLM in general has no continuing surveying authority and boundary issues will be resolved under State law.[23]

B.   *Studies Prior to 2014 of the Ordinary High Water Mark Through the Townships*

Shortly before statehood, the General Land Office (GLO) surveyed the Federal lands along the Missouri River in the Townships. The survey was completed in 1896, and the surveying plats were approved in 1897. The plats show the meander lines along the banks of the Missouri River, as it flowed through the Townships, along with the exterior and interior subdivisional lines of the Townships.[24] Under the survey instructions, the meander lines were intended to represent the OHWM at the time of the survey.[25] During

---

[16] See also footnotes 72-85, *infra,* and accompanying text discussing retroactive state statute that recognizes a fixed boundary.

[17] 2014 BLM Letter to State Commissioner, *supra* note 4, at 2.

[18] 43 U.S.C. §§ 2, 772 (2018); *see also, e.g., Lane v. Darlington,* 249 U.S. 331, 333 (1919) ("So long as the United States has not conveyed its land it is entitled to survey and resurvey what it owns and to establish and reestablish boundaries, as well one boundary as another . . . .").

[19] 2009 Survey Manual, *supra* note 9, at § 1-5 ("The instructions contained in this Manual will be observed by surveyors engaged in the execution of official Federal surveys. . . . A failure to follow the Manual may be considered an error.").

[20] *See id.* §§ 1-1 to 1-2 (summarizing history of public land surveying instructions).

[21] *Id.* §§ 3-162 to 3-172.

[22] *Id.* §§ 9-88 to 9-102.

[23] *See Ron Martin,* 130 IBLA 238, 241-42 (1994); *O.R. Williams,* 60 I.D. 301, 303 (1949) ("The [Federal] resurvey cannot establish the boundaries or survey lines of the privately owned land in the vicinity of the corner.").

[24] *See* AR, Record #6 (original survey plats).

[25] *See United States v. 11,993.32 Acres of Land,* 116 F. Supp. 671, 673 (D.N.D. 1953) ("According to the Manual of Surveying Instructions (1894), page 56, rivers were to be meandered at the ordinary mean high water mark."); *see also Gardner v. Green,* 271 N.W.

the ensuing decades after the original 1896 GLO surveys were completed, the United States conveyed many tracts of riparian public domain lands to private parties based on the GLO surveys but retained title to other riparian lands.[26]

The next major study of the riverbed in the Townships was completed in 1952 under the auspices of the U.S. Army Corps of Engineers (Corps) as part of its acquisition of land needed for the construction and operation of Garrison Dam. The Flood Control Act of 1944 had authorized construction of Garrison Dam (among others) on the Missouri River.[27] Construction of the dam was completed in 1953.[28] Prior to the filling of Lake Sakakawea, the Corps needed to acquire the land that would be inundated by the Lake. To know what lands to acquire, the Corps needed to know the then-existing boundary between the State-owned riverbed and the upland riparian property.[29]

Recognizing that the original 1896 GLO surveys no longer necessarily reflected conditions in 1952 given changes in the riverbed from processes such as erosion and accretion, the Corps asked BLM's cadastral surveyors to investigate the river as it existed in 1952 so that the Corps could develop "Acquisition Segment Maps." The Segment Maps applicable to the Townships reflect the location and extent of the riverbed as of 1952, along with the location of patented parcels and those remaining in Federal ownership.[30]

In assisting with the preparation of the 1952 Segment Maps, BLM's cadastral surveyors were instructed to ascertain, for "each lot or legal subdivision," "whether any or all of it is above mean high water at the present time" and, if so, whether it had been continuously above mean high water since the original survey was made.[31] The surveyors were instructed to make their determination by "study[ing] all plats, charts, maps, aerial

---

775, 781 (N.D. 1937) (stating with respect to meandered lake, "[i]n the absence of showing to the contrary it will, of course, be presumed that the meander line is also the shore line; and a person who claims that at the time of the survey there were lands between the meander line and the shore line has the burden of establishing that fact").

[26] *See, e.g., United States v. 11,993.32 Acres of Land,* 116 F. Supp. at 672-73 (discussing patenting of certain riparian public domain parcels based on the GLO surveys).

[27] *North Dakota v. United States Army Corps of Eng'rs,* 264 F. Supp. 2d 871, 874-75 (D.N.D. 2003) (discussing authorization and construction of Garrison Dam).

[28] United States Army Corps of Eng'rs, Garrison Project Statistics (published Aug. 6, 2012), https://www.nwo.usace.army.mil/Media/Fact-Sheets/Fact-Sheet-Article-View/Article/487634/garrison-project-statistics/ (last visited Mar. 23, 2020).

[29] Decision at 6-7.

[30] AR, Record #3.

[31] AR, Record #1, Folder #3, Att. 7-A, Special Instructions for Group No. 16, North Dakota, at 2 (Oct. 24, 1952) [hereinafter 1952 Special Instructions].

photographs, and records found that may have a bearing" on the issue, as well as by assessing the age of timber and "obtain[ing] such other information as is available including the interviewing of old settlers who may be familiar with the river changes at those places."[32] The administrative record filed with the Board contains the 1952 BLM field investigation files for the Townships at issue.[33]

The next significant study of the riverbed in the Townships was completed in 2011 by the State. As the State notes in its Statement of Reasons, by that time a "lively interest in mineral ownership and land boundaries" under Lake Sakakawea had emerged with the advent of techniques to reach and produce oil and gas deposits underlying the Lake.[34] After the State issued new guidelines in 2007 for "delineating the ordinary high water mark (OHWM) in both riverine and lake settings in North Dakota,"[35] the State tasked a private engineering firm to conduct a multi-phase study of the OHWM of the Missouri River above Garrison Dam.[36] The "Phase 2" study, completed in 2011 by Bartlett & West,[37] examined the OHWM of the "historic Missouri River" that existed prior to the creation of Lake Sakakawea along a 92-mile reach that included the Townships at issue.[38] The Bartlett & West Study applied the State's 2007 Delineation Guidelines in making its assessment and relied on aerial photography:

> Since neither the [North Dakota State Land Department (SLD)] nor the investigation team was aware of any historic OHWM determinations or delineations that would have been recorded prior to the completion of the

---

[32] Id. at 3.

[33] AR, Record # 5 (files for Group No. 16, North Dakota).

[34] SOR at 3.

[35] North Dakota State Engineer, Ordinary High Water Mark Delineation Guidelines (Jan. 2007), http://www.swc.nd.gov/pdfs/ordinary_high_water.pdf (last visited Mar. 23, 2020) [hereinafter 2007 Delineation Guidelines].

[36] See Technical Reports for Task Orders 1-4 prepared for the State of North Dakota, https://www.land.nd.gov/surface-minerals-management/mineral-auctions/missouri-river-ordinary-high-water-mark-ohwm-surveys (last visited Mar. 23, 2020) (follow menus to Technical Reports).

[37] Bartlett & West, Inc., and McCain and Associates, Inc., Final Technical Report for the Ordinary High Water Mark Investigation for the Missouri River under Lake Sakakawea (From Furlong Loop to New Town, ND) (March 2011), https://www.land.nd.gov/sites/www/files/documents/Minerals/OHWM2/ohwm%20report.pdf (last visited Mar. 23, 2020) [hereinafter Bartlett & West Study or 2011 State Study]. The Bartlett & West Study was largely prepared in 2010 and often referenced as the "2010" Study, but we use the year in which it was officially issued.

[38] Id. at 1.

Garrison Dam, the SLD and the team decided the most viable technique was to determine the OHWM using historic aerial photography, taken prior to the waters of Lake Sakakawea inundating the Missouri River in the Project area.[39]

The Bartlett & West Study used aerial photographs from 1943, 1951, and 1958.[40] The Study thus did not use or evaluate the Corps' 1952 Segment Maps or the underlying BLM surveyor investigations. The Bartlett & West delineation of the OHWM showed a significantly widened State-owned riverbed in numerous locations as compared to the original 1896 survey.[41]

C.   *BLM's 2014 OHWM Investigation and Development of the Supplemental Plats*

Like the State, BLM recognized that the original 1896 surveys needed updating to accurately reflect the OHWM of the Missouri River immediately prior to the filling of Lake Sakakawea. But BLM did not agree with the State's 2011 delineation.[42] Accordingly, in 2013 BLM issued instructions to its surveyors to prepare supplemental plats for 18 North Dakota townships to update the legal land descriptions of riparian public domain parcels in those townships.[43] BLM explained its objectives in a letter to the State's Commissioner of University and School Lands:

> The intent of this project is to accurately lease Public Domain minerals and alleviate leasing conflicts by updating the legal land descriptions of Public Domain parcels only, accounting for the movement of the Missouri River between original survey to just prior to the artificial rising of Lake Sakakawea. Cadastral Survey is creating these Supplemental Plats and delineating the OHWM, according to federal case law and guidance, to define the boundaries of Public Domain lands.[44]

Under BLM's 2009 Survey Manual,[45] supplemental plats are prepared from office records, which in this instance included the 1896 GLO surveys, the Corps' 1952 Segment

---

[39] *Id.* at 2.
[40] *Id.* at 3.
[41] Decision at 5.
[42] 2014 BLM Letter to State Commissioner, *supra* note 4, at 1-2.
[43] AR Record #1, Folder #1, Doc. 2, BLM Special Instructions at 1 (Oct. 30, 2013); *see also* AR, Record #1, Folder #1, Doc. 20, BLM Supplemental Special Instructions (Jan. 8, 2014) [hereinafter, collectively, 2013 Special Instructions].
[44] 2014 BLM Letter to State Commissioner, *supra* note 4, at 2.
[45] 2009 Survey Manual, *supra* note 9, at § 9-33 (page 309).

Maps, and BLM's 1952 field investigations.[46] After examining these records, BLM decided to adopt the riverbed boundaries shown on the Corps' 1952 Segment Maps as the OHWM.[47]

In April and May 2014, BLM's Chief Cadastral Surveyor for North Dakota accepted the four Supplemental Plats for the Townships which had been prepared by BLM's cadastral surveyors.[48] Each Plat depicted both the meander lines of the banks of the Missouri River as it flowed through the relevant sections of the Township, taken from the Corps' 1952 Segment Maps, and the original meander lines taken from the original 1896 GLO surveys, thus reflecting the extent to which Federal public domain lands along the river had either lost or gained acreage through erosion and accretion.[49]

By notice published in the *Federal Register* in July 2014, BLM informed the public that it would officially file the Supplemental Plats on August 7, 2014, but BLM provided the public an opportunity to file protests challenging the proposed official filing.[50] In response, North Dakota filed protests in August 2014 objecting to the "re-survey."[51] It asked BLM to stay the filing of the Plats so that it could determine "whether the [BLM] plats conflict with the State's most recent determination of the ordinary high water mark of the Missouri and Yellowstone Rivers within the State of North Dakota."[52] In December 2014, the State followed up with a one-page letter stating that BLM improperly relied on the Corps' 1952 Segment Maps rather than the State's 2011 Bartlett & West Study of the OHWM.[53] Asserting that North Dakota "owns several parcels now being claimed by BLM," the letter closed by "insist[ing]" that the Supplemental Plats not be filed.[54]

---

[46] *See* 2013 Special Instructions, *supra* note 43, at 1.
[47] Decision at 9.
[48] AR, Record #8 (the Supplemental Plats).
[49] *See id.*
[50] Notice of Filing of Plats of Survey; North Dakota, 79 Fed. Reg. 38,562 (July 8, 2014).
[51] AR, Record #1, Folder #1, Doc. 49 and Doc. 50, North Dakota's Protests (Aug. 4 and 5, 2014) (filed, respectively, by the North Dakota Dep't of Trust Lands and the Office of the State Engineer).
[52] *Id.*
[53] *See* AR, Record #1, Folder #1, Doc. 62, Letter from North Dakota State Engineer and State Land Commissioner to BLM State Director (Dec. 8, 2015).
[54] *Id.*

D.   *BLM Analysis of the State's Protest and March 2016 Decision*

To address the protest, BLM first completed an internal analysis of the State's contentions which evaluated and compared the State's Bartlett & West Study of the OHWM with the Corps' Segment Maps.[55] BLM then issued its Decision in March 2016 dismissing North Dakota's protests to the filing of the Supplemental Plats.[56] The Decision focused on two issues: (a) whether the State's 2007 OHWM guidelines, as applied in the Bartlett & West Study, should have been utilized in preparing the Supplemental Plats; and (b) whether the Corps' Segment Maps accurately reflected the OHWM of the River through the Townships in 1952.[57]

With respect to the State's Bartlett & West Study, BLM concluded that it should not be used because it did not correctly locate the OHWM prior to the filling of Lake Sakakawea.[58] BLM believed the Study incorrectly placed the OHWM landward of the actual mark in many areas, with the State's estimate of the riverbed's width almost tripling that of the original surveyed meanders in a number of locations.[59] BLM found "no known change in ordinary flow" that would account for such a significant overall widening.[60] BLM also questioned the Bartlett & West Study results because they depicted certain islands as State-owned submerged land even though the United States had previously purchased those lands from the State based on their upland status.[61] BLM estimated that the Bartlett & West delineation of the OHWM would result in significant acreage of BLM administered uplands (1140 acres subsurface and 896 acres surface) being improperly deemed as State-owned submerged lands in the protested Townships.[62]

---

[55] AR, Record #1, Folder #3, Doc. 1, BLM Memorandum from Blaise Lodermeier, Cadastral Surveyor, to Joshua Alexander, Chief, Branch of Cadastral Survey (Nov. 19, 2015) [hereinafter BLM November 2015 Memorandum] (comparing and evaluating the State's 2011 OHWM determination with the Corps' Segment Maps).
[56] Decision at 4-5.
[57] *See id.* at 1.
[58] *Id.* at 4-6, 9; *see also* BLM November 2015 Memorandum, *supra* note 55, at unpaginated (unp.) 1.
[59] Decision at 5 and Encl. 1 (map depicting State's 2011 OHWM against Supplemental Plats' determination).
[60] BLM November 2015 Memorandum, *supra* note 55, at 4; *see also* Decision at 5 ("[W]hile it is acknowledged that OHWMs move laterally, no evidence shows why the riverbed was widened, up to triple in size, to encompass lands classified as upland in the original survey.").
[61] Decision at 5-6.
[62] *Id.* at 1.

BLM believed the Bartlett & West Study overstated the State's riverbed acreage for two main reasons: it followed the State's 2007 Delineation Guidelines, which conflicted with the Federal OHWM definition;[63] and it relied on aerial photographs allegedly taken during flooding events on the River.[64] BLM particularly stressed that the State's 2007 Delineation Guidelines deviated from the Federal OHWM definition, and skewed the Bartlett & West OHWM determination landward, by placing certain lands below the OHWM even when they contained terrestrial vegetation and were suitable for grazing.[65] BLM thus rejected the use of the State's Bartlett & West determination because it improperly delineated the OHWM.[66]

Next, BLM rejected North Dakota's assertion that the 1952 Segment Maps did not accurately reflect the location of the OHWM prior to the flooding. BLM explained that the Segment Maps were based on contemporaneous field investigations by BLM cadastral surveyors, had been used to acquire private and State lands bordering the river, and had remained unchallenged for over 60 years.[67] In its internal analysis of the issue, BLM stated that it had compared the Segment Maps with historical aerial photographs, the 1952 field investigations, and other historical information (e.g., topographic maps and land appraisals) and confirmed that the river banks shown in the Segment Maps corresponded to the OHWM at the time.[68] In reaching this conclusion, BLM noted that its 1952 Special Instructions directed the surveyors "to use the mean high water (same location as the OHWM) in their determinations, which would have followed the federal definition."[69] Concluding that the Corps' 1952 Segment Maps offered the most comprehensive evidence of the historic OHWM, since they were "firmly grounded in guidance, methodology, and contemporaneous field investigations of the land prior to the effects of flooding," BLM dismissed the State's protest and stated that the Supplemental Plats would be filed.[70]

---

[63] *Id.* at 4-5.
[64] *Id.*; *see also* BLM November 2015 Memorandum, *supra* note 55, at unp. 3-6.
[65] Decision at 4-5; *see also* Reply Brief at 8 (filed Sept. 9, 2016).
[66] Decision at 4-6, 9.
[67] *See* Decision at 9.
[68] BLM November 2015 Memorandum, *supra* note 55, at unp. 6-7.
[69] *Id.* at unp. 7.
[70] Decision at 9, 10.

North Dakota timely appealed from BLM's March 2016 Decision. The State did not petition to stay the effect of the decision, and BLM filed the Supplemental Plats on April 29, 2016.[71]

E.    *State Legislative Action after Appeal*

After this appeal was filed, North Dakota enacted legislation in 2017 that provides new state law governing the OHWM of the Missouri River before the closure of Garrison Dam.[72] The new chapter to the North Dakota Century Code (N.D.C.C.) seeks to clarify mineral ownership under the Missouri River reservoirs, stating that "state sovereign land mineral ownership of the riverbed segments inundated by Pick-Sloan Missouri basin project dams extends only to the historical Missouri riverbed channel up to the ordinary high water mark."[73] The referenced "historical Missouri riverbed channel" is defined as the "channel as it existed upon the closure of the Pick-Sloan Missouri basin project dams," which includes the Garrison Dam.[74] The statute thus recognizes that the OHWM boundary is now fixed. The statute expressly states that it applies retroactively to the date of closure of the dams.[75]

The statute also addresses how to determine the historical OHWM and makes the determination retroactive, for purposes of mineral ownership, "to all oil and gas wells spud after January 1, 2006."[76] The statutory OHWM determination is different for Federal public domain lands than for other riparian property. For "nonpatented public domain lands owned by the United States," such as those at issue in this appeal, the statute requires that the OHWM of the historical Missouri riverbed channel "must be determined by the branch of cadastral study of the United States bureau of land management in accordance with federal law."[77] The Supplemental Plats provide this determination for the Townships at issue.

---

[71] *See* AR, Record #1, Folder #1, Doc. 75, Plat Filing Report (Apr. 29, 2016); AR, Record #1, Folder #1, Doc. 74, Memorandum from Acting Chief, BLM Branch of Cadastral Survey (Apr. 29, 2016).

[72] *See* N.D.C.C. ch. 61.33.1 (2019).

[73] *Id.* at § 61-33.1-02.

[74] *Id.* at § 61-33.1-01.

[75] *Wilkinson v. Bd. of Univ. & Sch. Lands*, 903 N.W. 2d 51, 57-58 (N.D. 2017) ("We conclude N.D.C.C. ch. 61-33.1 applies retroactively.").

[76] 2017 N.D. Sess. Laws ch. 426, § 4 (eff. Apr. 21, 2017) (quoted in *Wilkinson*, 903 N.W. 2d at 58).

[77] N.D.C.C. § 61-33.1-06.

For all other lands, the "corps survey must be considered the presumptive determination of the ordinary high water mark of the historical Missouri riverbed channel, subject only to the review process under this section and judicial review as provided in this chapter."[78] The "corps survey" means "the last known survey conducted by the army corps of engineers in connection with the corps' determination of the amount of land acquired by the corps for the impoundment of Lake Sakakawea . . . as supplemented by the supplemental plats created by the branch of cadastral survey of the United States bureau of land management."[79]

The referenced "review procedure" does not apply to public domain lands that were never patented out of Federal ownership, and so is not directly relevant to the property at issue here, but understanding the process is helpful given its relationship to the State's Bartlett & West Study and the Corps' Segment Maps. The statute required the North Dakota Industrial Commission's Department of Mineral Resources to hire a qualified engineering firm to determine "whether clear and convincing evidence establishes that a portion of the corps survey does not reasonably reflect the ordinary high water mark of the historical Missouri riverbed channel under state law."[80] The portion of Lake Sakakawea subject to this statutory review process extended from the northern boundary of the Fort Berthold Indian Reservation to an area southwest of Williston, North Dakota.[81]

The Commission hired a firm to conduct the review, and the firm issued a final report in 2018, commonly referred to as the Wenck Report.[82] The Wenck Report did not use the Bartlett & West Study in its analysis but applied the statute's definition of the OHWM,[83] with consideration also given to the State's 2007 Delineation Guidelines and BLM's 2009 Survey Manual.[84] The Wenck Report's OHWM determination does not correspond precisely with either the Corps' Segment Maps or the Bartlett & West Study, arriving at a riparian boundary that overall encompasses more State-owned acreage than

---

[78] *Id.* § 61-33.1-03(1).
[79] *Id.* § 61-33.1-01.
[80] *Id.* § 61-33.1-03(3).
[81] *Id.* § 61-33.1-03(2).
[82] Wenck Associates, Inc., "Ordinary High Water Mark of the Historical Missouri River Bed: Pre-Garrison Dam for the reach extending approximately 83 miles upstream of New Town, ND" (Oct. 2018), https://www.dmr.nd.gov/OrdinaryHighWaterMark/docs/2018-10-03_Amended_Final_OHWM_Report.pdf (last visited Mar. 23, 2020) [hereinafter Wenck Report].
[83] N.D.C.C. § 61-33.1-03(3).
[84] Wenck Report, *supra* note 82, at 2-1.

the Corps' assessment, but less than that of Bartlett & West.[85] As noted earlier, the Wenck Report does not attempt to determine the OHWM of riparian public domain land, because that determination is subject to the separate provisions of N.D.C.C. § 61-33.1-06 under which BLM's determination of the OHWM "in accordance with federal law" is deemed conclusive.

DISCUSSION

In this appeal, the State asserts that BLM's decision to file the Supplemental Plats should be overturned "and that any future survey work by the BLM on riparian land in North Dakota should conform with state law."[86] The State believes BLM erred by improperly applying Federal law, rather than North Dakota law, in determining the OHWM that existed immediately prior to the creation of Lake Sakakawea: "[T]he issue on appeal is whether federal law required that the BLM borrow and apply North Dakota law in delineating the OHWM, and having failed to do so, whether the BLM may formally file the plats."[87]

The State is correct that the State/Federal boundary shown in the Supplemental Plats would be different if the State's 2007 Delineation Guidelines had been used to determine the OHWM instead of Federal law (BLM follows Federal law through compliance with its 2009 Survey Manual[88]). As noted earlier, BLM itself believes the difference amounts to many hundreds of acres in the Townships.[89]

The State and BLM attribute the divergence in significant part to two differences between the State's 2007 Delineation Guidelines and BLM's 2009 Survey Manual. First, the State's Guidelines generally place land below the OHWM if it is suitable only for grazing (as opposed to suitable for growing an "ordinary agricultural crop"), while the BLM Survey Manual would typically place such land above the OHWM.[90] Second, the

---

[85] *Id.* at Chapter 6.0 and Tables (showing differences with Corps' Segment Maps); *see also* North Dakota Industrial Commission Order No. 29129 at 4 (Sept. 27, 2018), https://www.dmr.nd.gov/OrdinaryHighWaterMark/docs/or29129.pdf (last visited Mar. 23, 2020) (addressing comments that noted difference between Wenck Report and Bartlett & West Study).

[86] SOR at 18.

[87] Reply Brief at 2; *see also* SOR at 7-12, 18.

[88] *See* Decision at 2-3 (summarizing Federal caselaw and its application through the 2009 Survey Manual).

[89] *See supra* note 62, and accompanying text.

[90] *See* SOR at 8 (citing 2007 Delineation Guidelines § 3.5 and 2009 Survey Manual § 3-164); *see also* Decision at 4 (discussing differences in OHWM determination based on

State's Guidelines place all land which has predominantly wetland vegetative species below the OHWM, while the BLM 2009 Survey Manual sets such land above the OHWM, placing the OHWM water-ward to the point where the land has no terrestrial vegetative species.[91] Given these significant differences, the State is correct that BLM would have committed error if it had improperly rejected the use of State law in determining the OHWM.

But as discussed below, BLM did not err in deciding to apply Federal law rather than the State's 2007 Delineation Guidelines in making its OHWM determination. Moreover, the conflict with State law was eliminated in 2017 with the enactment of N.D.C.C. ch. 61-33.1, which retroactively adopted BLM's determination as the conclusive OHWM boundary for public domain lands. Thus, the Supplemental Plats comply with both State and Federal law, and BLM committed no error in deciding to officially file them.

A.    *Burden of Proof and Standard of Review*

When challenging a BLM survey prior to its acceptance and official filing, an appellant bears the burden to demonstrate, by a preponderance of the evidence, that the surveyor erred in the methodology used or the results obtained, or by failing to adhere to the Survey Manual.[92] The Board reviews BLM's legal conclusions under a *de novo* standard.[93] While the Board has the authority to review all aspects of BLM decisions *de novo*,[94] and thus may overturn erroneous surveys just like any other decisions made by

---

grazing); *Bartlett & West Study, supra* note 37, at 2 ("'Areas below the OHWM may have vegetation suitable for grazing but wetland vegetation capable of being grazed is not an 'ordinary agricultural crop . . . .'" (quoting *State v. Mills*, 592 N.W.2d at 594)).

[91] *Compare* 2007 Delineation Guidelines § 2.1 *with* 2009 Survey Manual § 3-167; *see also* SOR at 8 (discussing differences in vegetation tests); BLM November 2015 Memorandum, *supra* note 55, at unp. 3 (discussing differences); *Bartlett & West Study, supra* note 37, at 2 ("[OHWM] means 'that line below which the action of the water is frequent enough either to prevent the growth of vegetation or to restrict its growth to predominantly wetland species" (quoting N.D. Admin. Code, § 89-10-01-03 (2019))), 5 ("Areas identified below the OHWM that have greater than 50% wetland vegetation may still have inclusions of upland vegetation or trees.").

[92] *See Battle Creek Island Ranch, LLC,* 194 IBLA 214, 232 (2019).

[93] *See Davis Creek Mining Company,* 194 IBLA 173, 188 (2019); *Statoil USA E&P, Inc. v. Office of Natural Resources Revenue,* 185 IBLA 302, 313 (2015) (stating that the Board's review of legal questions is "unburdened by any prior interpretation of applicable law" by the agency).

[94] *See, e.g., U.S. Fish & Wildlife Service,* 72 IBLA 218, 220-21 (1983).

subordinates of the Secretary, the Board shows deference to the professional opinion of BLM's experts concerning matters within the realm of their expertise and that are reasonable and supported by record evidence.[95]

B.   *BLM Properly Applied Federal Law to Determine the OHWM on Public Domain Lands*

The State's argument concerning the choice of law is straightforward. The State begins from the uncontested premise that it received at the time of statehood title to the bed of the Missouri River through the Townships at issue under the Equal Footing Doctrine, with the State/Federal property boundary being an ambulatory one defined by the OHWM. The State has no quarrel with the original delineation of the OHWM at the time of statehood,[96] but it asserts that Supreme Court precedent requires BLM to apply state law in making the assessment of the post-statehood OHWM that existed in the 1950s.[97]

For its position, the State primarily relies on *Wilson v. Omaha Indian Tribe.*[98] In *Wilson,* the dispute involved riparian Federal property along the Missouri River – land held in trust by the United States for the Omaha Indian Tribe – that had never left Federal ownership. The Court held that Federal law governs a title dispute over land "with respect to which the United States has never yielded title or terminated its interest," but concluded that "state law should be borrowed as the federal rule of decision" in deciding whether the riparian parcel at issue had been created by avulsion or accretion (the title question hinged on the resolution of that issue).[99]

The Court decided to borrow state law based on its consideration of three factors: "whether there is need for a nationally uniform body of law to apply in situations comparable to this, whether application of state law would frustrate federal policy or functions, and the impact a federal rule might have on existing relationships under state law."[100] The Court found that each of these factors weighed in favor of applying state law

---

[95] *See, e.g., State of Colorado,* 187 IBLA 376, 391 (2016); *Fred E. Payne,* 159 IBLA 69, 77-78 (2003); *West Cow Creek Permittees v. BLM,* 142 IBLA 224, 238 (1998).
[96] *See* Reply Brief at 3 ("The state's original riverbed boundaries were delineated by meander lines on the federal government's original surveys. The state has no dispute with where those meanders were drawn.").
[97] SOR at 7-12.
[98] 442 U.S. 653 (1979).
[99] *Id.* at 670, 673.
[100] *Id.* at 672-73.

to the "avulsive-accretion riddle"[101] at issue in the case, concluding that "the question of land ownership within or adjacent to the river is best settled by reference to local law even where Indian trust land, a creature of the federal law, is involved."[102]

In the present case, North Dakota asserts that the quotation above from *Wilson* "is itself enough for the [Board] to overturn BLM's decision" and require BLM to apply local law.[103] To buttress its point, North Dakota cites judicial precedent that applies *Wilson* and borrows state law to resolve title disputes involving riparian Federal property,[104] as well as citing a Board decision that applies *Wilson* and borrows state law to decide an avulsive-accretion issue involving Federal property.[105] Because BLM unquestionably applied Federal law, rather than State law, in determining the OHWM that existed in the 1950s, North Dakota asserts all of these precedents confirm that BLM erred, and BLM's decision to file the Supplemental Plats must be reversed.

To begin, we agree with the State that Federal law governs the determination of the OHWM for riparian public domain lands that have remained in Federal ownership since before statehood.[106] North Dakota is also correct that *Wilson* requires us to assess whether state law should be borrowed as the rule of decision under the three-factor analysis set forth in that decision.[107]

To determine whether BLM should have borrowed state law, it is useful to examine how the Supreme Court evaluated the *Wilson* factors in determining to borrow state law governing the doctrines of accretion and avulsion. With regard to the first factor, the Court "perceive[d] no need for a uniform national rule to determine whether changes in the course of a river affecting riparian land owned or possessed by the United States . . . have been avulsive or accretive."[108] The Court saw "little reason" why federal interests should not be treated under the same state rules of property that apply to

---

[101] *Id.* at 673, 674.
[102] *Id.* at 676.
[103] SOR at 9 (¶20).
[104] *Id.* at 9 (citing, among other cases, *United States v. Aranson*, 696 F.2d 654, 658 (9th Cir. 1983), and *Devon Energy Prod. Co. v. Norton*, 685 F. Supp. 2d 614, 621-22 (W.D. La. 2010)).
[105] *Id.* at 9-10 (citing and discussing *David A. Provinse*, 89 IBLA 154, 158-59 (1985)).
[106] SOR at 7 (citing, among other authorities, *Hughes v. Washington,* 389 U.S. 290, 290-91 (1967)).
[107] *Id.* at 7-9; Reply Brief at 5.
[108] 442 U.S. at 673.

private persons in the same area "as long as the applicable standard is applied evenhandedly to particular disputes."[109]

The Court also relied on the evenhanded nature of state law in evaluating the second factor. The Court concluded that the application of state law regarding accretion and avulsion would not frustrate federal policy or functions since, under either a state or federal rule, on some occasions the United States may lose some land but on others it may gain, depending on the particular facts of the case.[110] The Court noted that federal courts will have jurisdiction to adjudicate Federal title disputes, so "[a]dequate means are thus available to insure fair treatment of tribal and federal interests."[111]

Finally, the Court concluded that States have a "substantial interest" in having state law resolve title controversies involving accretion and avulsion.[112] The Court stated that private landowners rely on state real property law when purchasing real property, and there is "considerable merit in not having the reasonable expectations of these private landowners upset by the vagaries of being located adjacent to or across from Indian reservations or other property in which the United States has a substantial interest."[113] The Court found that "[b]orrowing state law will also avoid arriving at one answer to the avulsive-accretion riddle in disputes involving Indians on one side and possibly quite different answers with respect to neighboring land where non-Indians are the disputants."[114]

The Court therefore decided that each factor favored applying State law to the question of whether the lands at issue had formed by accretion or avulsion, reciting the "'familiar doctrine'" that "'it is for the States to establish for themselves such rules of property as they deem expedient with respect to the navigable waters within their borders and the riparian lands adjacent to them.'"[115] The Court concluded: "We . . . agree with the Court of Appeals' conclusion that federal law governed the substantive aspects of the dispute, but find it in error for arriving at a federal standard, independent of state law, to determine whether there had been an avulsion or an accretion."[116]

The reasoning and holding in *Wilson* dealt with the doctrines of accretion and avulsion, not the determination of the OHWM; accordingly, North Dakota overstates its

---

[109] *Id.*
[110] *Id.*
[111] *Id.* at 674.
[112] *Id.*
[113] *Id.*
[114] *Id.*
[115] *Id.* at 675-76 (quoting *Arkansas v. Tennessee*, 246 U.S. 158, 176 (1918)).
[116] *Id.* at 678-79.

precedential significance in arguing that *Wilson* answers the question as to whether state law should be applied here. North Dakota assumes the Supreme Court's analysis under each of the *Wilson* choice-of-law factors applies equally to post-statehood OHWM determinations as to accretion and avulsion, but that assumption is unwarranted. In fact, the factors weigh in favor of applying a uniform Federal standard in OHWM determinations.

First, unlike the doctrines of accretion and avulsion, there is a need for a nationwide rule for assessing the OHWM of United States property that has never left Federal ownership. Without a uniform Federal OHWM rule, a state could increase the acreage awarded to it under the Equal Footing Doctrine at any time simply by adopting a more expansive interpretation of the OHWM than that found in Federal common law, even without the parcel leaving Federal ownership and without any change in the physical characteristics of the navigable waterbody. This acquisition of Federal property through OHWM redefinition directly contradicts the Constitutional principle that only Congress has the power to dispose of property of the United States[117] and that the "laws of the United States alone control the disposition of title to its lands."[118] Congress has enacted no law that allows a state to take land or minerals from the United States by crafting an expansive definition of OHWM and thereby increasing the acreage awarded to it under the Equal Footing Doctrine. A consistent, uniform, nationwide definition of the OHWM is thus critical to comply with Constitutional restrictions on the disposition of Federal lands.

North Dakota argues that the Equal Footing Doctrine has no relevance because the present case does not concern the location of the OHWM at the time of statehood but rather concerns the location of the OHWM in the 1950s when Lake Sakakawea was created.[119] North Dakota points out that the Supreme Court recognized in *Oregon v. Corvallis Sand & Gravel Co.* that "'[o]nce the equal-footing doctrine had vested title to the riverbed in [the State] as of the time of its admission to the Union, the force of that doctrine was spent; it did not operate after that date to determine what effect on titles the movement of the river might have.'"[120] North Dakota asserts that after statehood "'subsequent questions of land title, such as ownership of land uncovered when a river

---

[117] U.S. Const. art. IV, § 3.
[118] *United States v. Oregon*, 295 U.S. 1, 27-28 (1935).
[119] *See* Reply Brief at 3-4.
[120] *Id.* at 4 (quoting *Oregon v. Corvallis Sand & Gravel Co.*, 429 U.S. 363, 371 (1977)).

moves, are a matter of state law.'"[121] Therefore, asserts the State, "the equal footing doctrine is irrelevant" to determining the OHWM after statehood.[122]

North Dakota's reliance on *Corvallis* and its progeny is misplaced. As the Court in *Wilson* and other later cases clarified, the holding in *Corvallis* addressed land that had left Federal ownership, not land that had continuously remained owned by the United States: "*Wilson* . . . made clear that *Corvallis* also does not apply 'where the [United States] Government has never parted with title and its interest in the property continues.'"[123] Here, we are concerned with the application of the State's OHWM definition to retained public domain lands, so the *Corvallis* holding is not applicable.

But more fundamentally, the "spent force" of the Equal Footing Doctrine actually highlights the flaw with North Dakota's position – the State is implicitly relying on the Doctrine as its source of authority for applying the State's definition of the OHWM to public domain lands and thereby expand its acreage as compared to the Federal definition. The State has pointed to no other doctrine, statute or grant of authority that would allow it to acquire title to Federally-owned riparian public domain land. But the Equal Footing Doctrine does not give the State this authority. The Doctrine simply ensures that "a newly admitted State receives absolute title to beds of navigable waters within the State's boundaries from high watermark to high watermark."[124] This Constitutionally required grant of property to a new state is determined by applying Federal law at the time of statehood, with both navigability and the OHWM being determined by application of Federal common law rules.[125] As *Corvallis* emphasized, this grant of property is all the Equal Footing Doctrine did – its force was spent. It does not

---

[121] Reply Brief at 4 (quoting *United States v. 32.42 Acres of Land*, 683 F.3d 1030, 1036 (9th Cir. 2012) (citing *Corvallis*, 429 U.S. at 370-71)); *see also Cinque Bambini Partnership v. State*, 491 So.2d 508, 519 (Miss. 1986), *aff'd sub nom.*, 484 U.S. 469 (1988) ("[w]hether the operation of the forces of nature could thereafter [following statehood] add to or subtract from the properties so held by the State is a matter wholly governed by state law").

[122] Reply Brief at 4.

[123] *Cal. ex rel. State Lands Comm'n v. United States*, 457 U.S. 273, 282 (1982) (quoting *Wilson,* 442 U.S. at 670).

[124] *Reep v. State,* 841 N.W.2d 664, 671 (N.D. 2013).

[125] *See Corvallis,* 429 U.S. at 370-71 (stating that Federal law fixes "the initial boundary line between fast lands and the riverbeds at the time of a State's admission to the Union"); *PPL Montana, LLC,* 565 U.S. at 591 (explaining that it follows from the Constitutional basis of the equal footing doctrine that "any ensuing questions of navigability for determining state riverbed title are governed by federal law").

provide the State implied authority post-statehood to acquire additional Federal lands by redefining the tests for either the OHWM or navigability.[126]

In other words, the Equal Footing Doctrine is relevant to show the limitations placed on both the State and Federal governments after statehood in affecting the land title of the other: after statehood, neither government's land is subject to defeasance by the other because of the Doctrine. The Doctrine provided the State with riverbed title at statehood, but it provided no continuing authority to acquire additional Federal land by an expansive OHWM definition that would apply regardless of whether any physical changes had occurred to the river channel. To avoid unauthorized land acquisitions and ensure equal treatment of all States, a uniformly applied OHWM definition is needed for the State/Federal boundary of riparian public domain land.

Turning to the second *Wilson* factor, the imposition of individual state standards for determining the OHWM would frustrate a range of Federal policies and functions. Foremost, as discussed above, it would effectively allow States to acquire Federal land without Congressional authorization simply by adopting an expansive OHWM definition, even without any physical changes occurring to any waterbody. The resulting boundary changes (which could happen whenever a State chose to adopt a new OHWM definition) would necessarily disrupt existing leases and permits issued by the United States on the impacted public domain lands.

Of importance, this frustration of Federal functions would not be the coincidental result of a neutral, evenhanded State rule that "operates without particular favor or detriment" to the United States.[127] Unlike the doctrines of accretion and avulsion, applying a State defined OHWM is not evenhanded in its effect because the State always wins. While facially the State OHWM standards would apply equally to all riparian landowners, the State would benefit almost exclusively as the owner of the bed of navigable waterways. The OHWM definition has no meaningful impact on riparian landowners along nonnavigable waterbodies since they hold title below the OHWM to the center of the waterbody.[128] Thus, a redefined OHWM standard such as North Dakota's would apply to expand the State's holdings virtually exclusively. True, private riparian landowners would be negatively impacted along with the Federal government,

---

[126] *See PPL Montana, LLC,* 565 U.S. at 604-05 (holding that Montana could not assert riverbed title and "'enlarge what actually passed to the State'" based on a state-law retroactive definition of navigability (quoting *Brewer-Elliott Oil & Gas Co. v. United States,* 260 U.S. 77, 88 (1922))).
[127] *See United States v. Hess,* 348 F.3d 1237, 1246 (10th Cir. 2003) (discussing and applying *Wilson* factors).
[128] *See Amoco Oil Co. v. State Highway Dep't,* 262 N.W.2d 726, 728 (N.D. 1978).

but the fact that the State has stacked the deck against all other landowners does not make the rule evenhanded or less detrimental to the Federal government's interests. In sum, North Dakota's revised OHWM guidelines at issue here are not neutral but rather weighted to ensure that the State is accorded the maximum amount of land along a navigable river, at the expense of the United States and any other riparian landowner, and thereby frustrate Federal functions.[129]

Finally, with regard to the impact a federal rule might have on existing relationships, it would not negatively affect private landowners or implicate a substantial, nonpecuniary interest of the State. Because the Federal OHWM definition would only be applied by BLM when delineating the boundary between Federal public domain uplands and State riverbed land, it would not result in having "the reasonable expectations of . . . private landowners upset by the vagaries of being located adjacent to . . . property in which the United States has a substantial interest."[130] Whether or not Federal law applied to the public domain riparian boundary, an adjacent private property holder would have its riparian boundary line with the State determined by state law, resulting in no impact to existing private property rights.

In summary, each of the *Wilson* factors weighs in favor of applying a uniform Federal rule to determining the OHWM of retained Federal public domain land along navigable waterways. In the Court's subsequent *California* decision, it noted as a final factor in favor of applying Federal law that "this is not a case in which federal common law must be *created*."[131] The same observation applies here. The United States has determined the OHWM along navigable waterways for over a hundred years applying Federal standards, with patents being issued and land being purchased on the basis of those determinations.[132] While the State certainly can manage its submerged lands as it

---

[129] *See also United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 595-96 (1973) ("[E]ven assuming in general terms the appropriateness of 'borrowing' state law, specific aberrant or hostile state rules do not provide appropriate standards for federal law."). *Central Pines Land Co. v. United States*, 274 F.3d 881, 890 (5th Cir. 2001), *cert. denied*, 537 U.S. 822 (2002) ("Refusing to apply state law is appropriate when national uniformity is required, as well as when state law conflicts with federal interests.").
[130] *Wilson v. Omaha Indian Tribe*, 442 U.S. at 674.
[131] *California ex. Rel. State Lands Comm'n*, 457 U.S. at 284 (discussing why state law would not be borrowed to adjudicate title disputes over relictions to oceanfront land where title rests with or is derived from the Federal Government).
[132] *Cf. id.* ("For over 100 years it has been settled under federal law that the right to future accretions is an inherent and essential attribute of the littoral or riparian owner.").

wishes,[133] and can subject uplands that pass out of Federal ownership to the OHWM definition it has chosen, that power does not extend to the *de facto* acquisition of retained public domain land by a retroactive expansive definition of the OHWM that applies regardless of whether physical changes occurred to the Missouri River since statehood.[134] Federal law applies to BLM's determination of the OHWM along retained Federal riparian property, and state law should not be borrowed.

None of the post-*Wilson* cases cited by the State suggests a different conclusion.[135] No case has held that a state's definition of the OHWM should be applied to Federal public domain land. Some cases follow *Wilson* in applying state law to adjudicate the legal consequences of physical changes to navigable waterbodies caused by processes such as accretion, erosion, reliction, or avulsion. The Board's decision in *David A. Provinse*[136] is a good example. The issues in *Provinse*, as they were in *Wilson,* concerned the doctrines of accretion and avulsion as applied to Federal land along a navigable river. The Board followed *Wilson* and applied North Dakota law governing avulsion and accretion to adjudicate the issues.[137] Our decision had no detailed discussion of the three *Wilson* factors, only noting that "the same factors [as in *Wilson*] are present in the case at issue, *i.e.* a navigable stream where the riparian lands do not involve an interstate boundary."[138] Thus, neither the holding nor the reasoning in *Provinse* suggests that State law should also be applied to the determination of the OHWM on public domain land.

Similarly, the two judicial cases cited by the State that involved Federal riparian land were both instances where the underlying issues involved accretion or reliction, and the courts followed *Wilson* in applying State law to adjudicate the legal effect of these physical changes to the land.[139] Neither case addressed the OHWM or provided reasoning that would apply to the OHWM.

---

[133] *See, e.g., Montana v. United States,* 450 U.S. 544, 551 (1981) ("After a State enters the Union, title to the land [under navigable waters] is governed by state law.").

[134] *Accord* 2009 Survey Manual, *supra* note 9, at § 3-172 ("Individual States may develop their own rules for determination of their own boundaries as against private owners but such State laws cannot generally act to reduce Federally owned areas or otherwise alter the boundaries of Federal land.").

[135] *See* SOR at 9-12.

[136] 89 IBLA 154 (1985).

[137] *Id.* at 159 ("We . . . conclude, based on *Wilson v. Omaha Indian Tribe,* that state law should be applied here.").

[138] *Id.*

[139] *United States v. Aranson,* 696 F.2d at 658 (applying state law on accretion because the *Wilson* "holding governs this case"); *Devon Energy Production Co. L.P. v. Norton,* 685 F. Supp. 2d at 621-22 (applying state law on reliction based on *Wilson* factors).

North Dakota also cites two Tenth Circuit cases for the proposition that "[s]tate law is commonly adopted in other kinds of disputes involving federal property interests."[140] But state law is also not adopted in many circumstances,[141] and the State's general proposition does not mean state law should be applied here. Neither case it cites concerns watercourses or riparian property – *Southern Utah Wilderness Alliance* applies state law in interpreting a Federal statute granting rights-of-way across public lands and *Hess* applies state law in construing the meaning of a mineral reservation contained in an exchange patent issued under the Indian Reorganization Act.[142] The discussion of the *Wilson* factors in these cases is simply not germane to the very different factual and legal circumstances presented in this appeal, and the cases provide no reasoning that would justify applying the State's definition of the OHWM to public domain lands.

Finally, the State attempts to create a new choice-of-law test by arguing that BLM "must show a 'compelling need' to reject state law."[143] No such test exists. The Supreme Court did not create a "compelling need" rejection test in *Wilson*, and even the quoted Tenth Circuit decision did not apply such a test but instead discussed the *Wilson* factors and used the "compelling need" phrase merely in summarizing its conclusion: "Seeing no compelling need for the development of a federal common law concerning the construction of reservations of mineral rights in instruments effecting land exchanges, we conclude that here, as in *Wilson*, the content of federal law should be determined by reference to state law."[144] In any event, even if the test existed, it would be met in this instance for the reasons discussed earlier. There is a compelling need for a Federal OHWM definition to be applied uniformly to riparian public domain land to avoid

---

[140] SOR at 9 (citing *Southern Utah Wilderness Alliance v. BLM,* 425 F.3d 735, 766-67 (10th Cir. 2005), and *United States ex rel. Southern Ute Indian Tribe v. Hess,* 348 F.3d 1237, 1243 (10th Cir. 2003)).

[141] *See, e.g., Little Lake Misere Land Co.,* 412 U.S. at 604 (refusing to apply state law to dispute concerning Federal mineral rights); *Cal. ex rel. State Lands Comm'n,* 457 U.S. at 283-84 (refusing to borrow state law as the rule of decision for title dispute involving effect of reliction on Federally owned coastal uplands); *California ex rel. State Lands Com. v. United States,* 805 F.2d 857, 861-64 (9th Cir. 1986), *cert. denied,* 484 U.S. 816 (1987) (refusing to apply state law to dispute involving reliction of Federally owned property adjoining inland lake).

[142] *See Southern Utah Wilderness Alliance,* 425 F.3d at 768 (borrowing state law "in determining what is required for acceptance of a right of way under the statute"); *Hess,* 348 F.3d at 1243 (borrowing state law to construe "reservations of mineral rights in instruments effecting land exchanges").

[143] SOR at 11 (quoting *United States v. Hess,* 194 F.3d 1164, 1173 (10th Cir. 1999)).

[144] *Hess,* 194 F.3d at 1173.

unauthorized acquisition of Federal land and prevent the frustration of Congressionally-mandated Federal land management duties. Therefore, BLM committed no error in applying Federal law to create its Supplemental Plats.

C.   *Even if State Law Applied, North Dakota Has Not Shown that BLM Erred*

Although we have concluded that BLM committed no error in applying Federal law when developing the Supplemental Plats, we alternatively conclude that BLM also complied with State law as it was retroactively amended in 2017. Because the North Dakota Supreme Court is considering a challenge to the constitutionality of the statute under the North Dakota Constitution,[145] we make this an alternative holding and emphasize that BLM did not err even if the statute is found to be invalid.

As discussed earlier, North Dakota state law was amended in 2017 to accept BLM's determination of the OHWM of the historical Missouri riverbed channel with respect to retained public domain land:

> [T]he ordinary high water mark of the historical Missouri riverbed channel abutting nonpatented public domain lands owned by the United States must be determined by the branch of cadastral study of the United States bureau of land management in accordance with federal law.[146]

The statute also provides that "[t]he high water mark determination under this Act is retroactive and applies to all oil and gas wells spud after January 1, 2006, for purposes of oil and gas mineral and royalty ownership."[147]

Under the terms of these provisions, State law adopts BLM's determination of the OHWM of the riverbed channel for unpatented public domain land such as the tracts at issue here. The Supplemental Plats thus fully comply with existing State law.

In reaching this conclusion, we find no basis to conclude that the North Dakota legislature intended to borrow state law as the federal rule of decision when it provided that BLM's determination must be made "in accordance with federal law."[148] The North Dakota Supreme Court has stated that "[w]hen the Legislature does not define a phrase, we must give words in a statute their plain, ordinary and commonly understood meaning."[149] That commonly understood meaning presumes that Federal law differs

---

[145] *Sorum v. State of North Dakota,* ND Docket No. 20190203 (filed June 27, 2019).
[146] N.D.C.C. § 61-33.1-06.
[147] 2017 N.D. Sess. Laws ch. 426, § 4 (eff. Apr. 21, 2017).
[148] N.D.C.C. § 61-33.1-06.
[149] *Cartwright v. Tong,* 896 N.W.2d 638, 644 (2017) (citing N.D.C.C. § 1-02-02).

from State law, and that BLM would make its determination in accordance with that distinct Federal law.

In addition, we have found nothing in the statute's legislative history that would suggest the legislature intended for State law to be borrowed. To the contrary, in commenting on the amendment that created § 61-33.1-06, the State's Commissioner of University and School Lands lamented that it would make BLM's determination under Federal law conclusive even if State law would place the land below the OHWM:

> The proposed Amendment defers to the federal Bureau of Land Management (BLM) regarding ownership of public domain land, even if those lands fall within or beneath the historical OHWM.
>
> The Committee should know that this is not established case law as some have suggested. The State has argued that it, not the federal government, defines sovereign ownership. The State is litigating this issue with an administrative appeal with the Department of the Interior Board of Land Appeals and filed pleadings in 2016. The State[] has argued that its definitions of Rivers apply, not the federal standard.
>
> The Amendment will simply defer the ownership decision to the BLM and relinquish thousands of mineral[] acres from state to federal control.[150]

As this quote illustrates, the Commissioner understood the provision to mean that the Federal definition of the OHWM would be applied by BLM in making its determination. In sum, the language and legislative history of N.D.C.C. § 61-33.1-06 confirm that it means that State law adopts the BLM's Federal law determination of the OHWM for nonpatented public domain parcels underlying Lake Sakakawea. Thus, the Supplemental Plats fully conform to existing State law, and on this alternative basis we also affirm BLM's decision to officially file the Supplemental Plats.

---

[150] Memorandum from Lance Gaebe, Comm'r of Univ. & School Lands, to House Energy and Natural Resources Subcommittee Chairman Keiser and Members at unp. 2 (Mar. 24, 2017), https://www.legis.nd.gov/files/resource/65-2017/library/sb2134.pdf (page 586) (last visited Mar. 23, 2020).

D.   *North Dakota Has Not Alleged or Shown "Non-Choice-of-Law" Errors with*
     *BLM's Decision to File the Supplemental Plats*

North Dakota emphasizes in both its statement of reasons and reply brief that it is alleging error solely based on BLM's choice of law.[151] Consistent with this position, North Dakota argues that BLM's criticism of the State's Bartlett & West Study is irrelevant: "It is not necessary to assess and respond to these arguments [concerning the Bartlett & West Study] because the essential issue, choice of law, has been addressed. Because state law applies, it does not matter what standards, criteria, guidelines, etc., were applied by the BLM and why it thinks they result in a superior product."[152]

Despite disclaiming any relevancy to BLM's critique, North Dakota then attempts to rebut BLM's criticisms and defend the Bartlett & West Study.[153] But the State concludes its defense by once again asserting that the issue is irrelevant: "The BLM misses the point in . . . attacking Bartlett & West. The issue is whether the BLM conducted the surveys and prepared the plats under appropriate law."[154]

We largely agree with the State's relevancy point. In its Reply, North Dakota reiterates that the Bartlett & West Study "is not at issue in this appeal . . . . [T]he state does not assert the BLM must accept the state's 2011 [Bartlett & West] study."[155] The State thus unambiguously does not assert error based on BLM's criticism of the Bartlett & West Study (even though it disagrees with BLM's criticism). And even if the State had asserted error on that basis, the validity of BLM's criticisms would still be irrelevant given that BLM properly rejected the Bartlett & West Study, regardless of its other merits, because it applied State rather than Federal law. Accordingly, we affirm BLM on the choice-of-law bases discussed above and do not opine on whether BLM's criticism of Bartlett & West is otherwise justified.

---

[151] SOR at 7 (stating the issue as "being whether it was proper for BLM to apply federal law, and reject state law, in identifying the historical OHWM on public domain land bordering the Missouri River"); Reply Brief at 2 ("[T]he issue on appeal is whether federal law required that the BLM borrow and apply North Dakota law in delineating the OWHM, and having failed to do so, whether the BLM may formally file the plats.").

[152] *Id.* at 12.

[153] *Id.* at 13-18.

[154] *Id.* at 18.

[155] Reply Brief at 7.

For the same relevancy reason, we do not address BLM's contention,[156] or the State's denial,[157] that North Dakota participated in and even supported the Corps' 1952 delineation of OHWMs along the river. Even if the State previously endorsed the Corps' work, that fact is not relevant to the choice-of-law issue presented by this appeal. Accordingly, we have attributed no probative value to BLM's intimations regarding North Dakota's support for the Corps' OHWM delineation.

However, the State makes one contention in defending Bartlett & West that should be addressed. The State alleges that BLM's reliance on the Corps' Segment Maps is unjustified because the surveyors in 1952 were not instructed to delineate the OHWM but instead instructed to do "the minimum work necessary" to identify the "approximate position" of public domain tracts.[158] The State opines that these "are not the kind of instructions that instill confidence in determining property boundaries."[159]

But the record shows that BLM addressed this and similar concerns in deciding whether to adopt the riverbank delineation in the Segment Maps as the OHWM determination. BLM observed that the 1952 Special Instructions directed BLM's cadastral surveyors to determine whether the public domain lands along the river were "in existence above mean high water at the present time,"[160] which BLM noted was the "same location as the OHWM."[161] BLM then verified that the 1952 OHWM determination by BLM's cadastral surveyors was carried over to the banks of the river depicted in the Corps' Segment Maps.[162]

In addition, BLM "performed a quality check" to ensure the Segment Maps accurately reflected the OHWM at the time.[163] BLM did so by comparing the Segment Maps with aerial photographs and topographic maps of the Missouri River, created as close to the time of the 1952 field investigations as possible, noting whether there were any differences between the riverbanks shown in the Segment Maps and aerial evidence

---

[156] *See* Decision at 8; Answer at 5, n.2.
[157] *See* SOR at 16-17.
[158] *Id.* at 13 (quoting the 1952 Special Instructions, *supra* note 31, at 5).
[159] *Id.*
[160] 1952 Special Instructions, *supra* note 31, at 2.
[161] *See* BLM November 2015 Memorandum, *supra* note 55, at unp. 7 ("[The 1952 Special Instructions directed the BLM cadastral surveyors] to use the mean high water (same location as the OHWM) in their determinations . . . .").
[162] *See id.* ("[T]he Segment Map banks were found to coincide with the Cadastral Engineers OHWM determinations.").
[163] *Id.*

of the OHWMs.[164] BLM concluded that the 1952 Segment Maps depicted the historic OHWM in the Townships:

> [A]fter studying all known historical aerial photography (1939, 1943, 1949, 1951, 1952, 1958) and topo[graphic] maps (1933 soil survey, 1943 topo) and comparing them to the [Corps] Segment Maps, the banks shown on the [Corps] Segment Maps coincide with where the federal definition [of] the OHWM is located. This determination includes studying vegetation, improvements, agricultural uses, former banks and other conditions evident on the aerial photos.[165]

BLM found "[m]iniscule differences" between the OHWMs derived from the Segment Maps and the aerial photographs but concluded they were due to differences between the dates of the field investigations and the dates of the aerial photographs that merely reflected the movement of the river.[166]

Given BLM's description of its review process to ensure the Corps' Segment Maps reflected the OHWM in 1952, we conclude that the State has failed to show any error in BLM's reliance on the Segment Maps in preparing the Supplemental Plats. Therefore, North Dakota has failed to establish, by a preponderance of the evidence, any error in BLM's Decision to file the Supplemental Plats.

---

[164] *See* 2014 BLM Letter to State Commissioner, *supra* note 4, at 2 ("The river location on the [Corps] maps was delineated in conjunction with BLM's Cadastral Survey in the 1950's and has been verified using aerial photography for each individual township prior to being accepted and utilized in the Supplemental Plats.").

[165] BLM November 2015 Memorandum, *supra* note 55, at unp. 6. The aerial photographs and topographic maps are found on two DVDs in the administrative record (AR, Record #10).

[166] Decision at 9.

IBLA 2016-170

CONCLUSION

For the reasons discussed above, North Dakota has failed to show that BLM erred in dismissing its protest and officially filing the Supplemental Plats. BLM properly applied Federal law, rather than State law, in making its OHWM determination. Accordingly, pursuant to the authority delegated to the Board of Land Appeals by the Secretary of the Interior,[167] we affirm BLM's Decision to officially file the Supplemental Plats.

KEVIN
HAUGRUD

Digitally signed by KEVIN
HAUGRUD
Date: 2020.03.25 09:28:08
-04'00'

K. Jack Haugrud
Administrative Judge

I concur:

SILVIA
IDZIOREK

Digitally signed by SILVIA
IDZIOREK
Date: 2020.03.25 09:39:04
-04'00'

Silvia Riechel Idziorek
Acting Chief Administrative Judge

---

[167] 43 C.F.R. § 4.1 (2019).

195 IBLA 223